IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 15-10085-01, 02-JTM

vs.

DANIEL C. NICHOLSON and NICOLE
MCQUISTON,

Defendants.

MEMORANDUM AND ORDER

On June 12, 2015, DEA Special Agent Gregory Anderson applied for a search
warrant targeting 11924 East Lewis, Wichita, Kansas, the residence of Daniel Nicholson.
In support of the warrant, Anderson submitted a 24-page affidavit reporting the results
of a joint investigation by the DEA, the ATF, the Kansas Bureau of Investigation, the
Wichita Police Department, the Sedgwick County Sheriff's Office, and the Texas
Rangers into alleged drug trafficking and money laundering by Nicholson and his
associates, including Nicole McQuiston and Justin Rourke. Nicholson allegedly
operated an extensive and sophisticated operation which imported methamphetamine

into Kansas from the brothers Ruben and Ismael Enriquez, who operated in Texas and Mexico.

United States Magistrate Judge Ken Gale approved the warrant on June 12, 2015, and the residence was searched. Agent Anderson then submitted a brief Supplemental Affidavit reporting the results of the search.

Defendant Nicholson has now moved to suppress the results of the search by means of a 98-page memorandum (Dkt. 266) which argues that Anderson's affidavits deliberately or recklessly misstated the evidence, and seeks a hearing as to the validity of the warrant. Defendant McQuiston subsequently joined this motion (Dkt. 271). Together, defendants attack various portions of the affidavit in detail, suggesting inconsistencies in the record and arguing the investigators should have used other procedures.

The Fourth Amendment prohibits an affiant in an application for a search warrant from knowingly and intentionally, or with reckless disregard for the truth, making a false statement. *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001) (citing *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978)). Where an affiant makes a false statement, the warrant must be voided if the affidavit's remaining content is insufficient to establish probable cause. *See id.* The Tenth Circuit has applied this rule "to intentional or reckless omissions of material facts, which, if included, would vitiate probable cause." *Id.* (citing *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir. 1990)). Recklessness can be inferred where the omitted facts were "clearly critical" to a finding of probable cause. *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990). In a case where defendant

alleges that information was intentionally omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and determining whether the affidavit would still give rise to probable cause. *Basham*, 268 F.3d at 1204.

To warrant a hearing, defendant must make a substantial showing that officers knowingly and intentionally included a material false statement or omission in the warrant affidavit. *See Franks*, 438 U.S. at 155-56. If a defendant satisfies that requirement, the court conducts an evidentiary hearing where defendant must show "by a preponderance of the evidence that the false statement was included in the affidavit by the affiant 'knowingly and intentionally, or with reckless disregard for the truth,' and the false statement was 'necessary to the finding of probable cause.'" *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (quoting *Franks*, 438 U.S. at 155–56).

Because the affidavit in support of the warrant was itself extensive, the court will review what Agent Anderson wrote in the affidavit, and review defendants' objections.

## Background

The affidavit generally stated that during the course of the investigation, through surveillance, court authorized intercepted calls, and cooperating individuals, information had been uncovered revealing Daniel Nicholson was working in concert with Nicole McQuiston, Justin Rourke, and others both known and unknown, in the facilitation of drug trafficking and money laundering crimes. Anderson states in the

affidavit that Nicholson's organization was well-organized and compartmentalized, and is responsible for receiving and the distribution of large amounts of methamphetamine in the Wichita, Kansas area and elsewhere. The organization was supplied large amounts of methamphetamine from Ruben Enriquez, who resided in the Lufkin, Texas area, and his brother Ismael Enriquez, who resided in the area of Durango, Mexico.

**Information from Morey**

On September 8, 2014, Task Force Officers Maria Heimerman and Tim Eldredge interviewed a source of information who was knowledgeable of a portion of the interworkings of the Nicholson organization. This source reported that Nicholson's organization was known to have hidden safes built to store drug proceeds and methamphetamine. The source did not specify the location or addresses of these hidden safes.

This source, who was not named in the affidavit but is Michele Morey, was able to provide the investigators details of the organization by providing the main targets and their role within the organization. The source admitted to having direct involvement as a distributor for the organization and having an outstanding debt. The source asked for protection from the investigators, and Agent Anderson reported he was able to corroborate this source's information through recorded jail calls and other statements. Anderson reported that at the time of the affidavit, the source's location was

unknown, and that the investigators had failed to find the source. He also did not know if the source had returned to work for the organization.

The defendants contend this portion of the affidavit is misleading, citing an interview Special Agent Troy Rhodes had two months earlier with Morey. Morey told Rhodes in a July 3, 2014 statement that she had moved into the residence of Ricky Clark at 2012 S. Wichita in Wichita, and learned Clark was involved in the distribution of methamphetamine, along with Danny Nicholson and Dave Teague. Morey also reported that at one point Nicholson "opened a safe in the residence and began pulling out gallon size bags of methamphetamine." She also indicated that there were "four of five safes in the residence and she estimated 30 to 40 lbs of methamphetamine and possibly $500,000 in cash."

According to defendants, the statement is misleading because it obscures the fact that Morey only knew about the presence of safes in Clark's residence, and that it misled the magistrate judge into believing the source knew about Nicholson's residence. Additionally, defendants object that the affidavit asserts that additional sources confirmed "all the information" supplied by the source. The defendants claim that the affidavit is false because it asserts Morey was a distributor for the Nicholson organization. According to defendants, Morey only worked for Clark, pointing to statements in the notes such as those indicating that she worked at "taking care of all of [Clark's] customers."

But the notes of the July interview cannot fairly be read to indicate that Morey

worked *only* for Clark. She contacted Agent Rhodes because she wanted to speak about the "NICHOLSON drug trafficking organization (DTO)." The notes make it plain both that Clark and Nicholson were in business together, sharing the profits (finding Morey at Clark's residence, Nicholson was "extremely upset" at Clark for leaving Morey "alone with *their* fortune" (emphasis added)), that the relationship had lasted for some time ("CLARK and NICHOLSON had been in business about three years and had started the business on Lulu Street"), and that, ultimately, Nicholson was the leader of the organization (accused of stealing "from the DTO" while Nicholson was incarcerated, Clark told Morey he was going to meet with Nicholson when he was released and make an accounting but that "it was a possibility he would not return from this meeting"). And, in her later interview with Heimerman, Morey reported she "believes that CLARK and NICHOLSON are still working together."

Nor does the affidavit fairly appear to suggest that "all of the information" ever uttered by Morey was corroborated by the investigators. Rather, the affidavit simply indicates that the substance of the source's information — as previously related in the affidavit — had been found to have support in other information. The materials before the court indicate that the substance of Morey's report — that she was actively involved in the Nicholson organization, that the organization was involved in importing methamphetamine to Kansas on a large scale, and that the organization protected its drugs and money by using safes located in the residences of its members — was indeed corroborated by the investigation.

6

Defendants complain that some of the information cited in the affidavit was obtained by monitoring calls while Nicholson was held in the Butler County jail, and argues that such monitoring violated guidelines established by the Department of Justice for electronic monitoring of prisoners held by the Bureau of Prisons. The guidelines cited by defendants indicate that it is Bureau of Prisons policy to require a court order if information is sought as part of a criminal investigation. Accordingly, defendants argue, Anderson's affidavit was misleading because it did not disclose what they claim was a violation of those guidelines.

The court finds the affidavit was not misleading. Anderson does relate that he was able to corroborate Morey's information from "through recorded jail calls or other SOI [source of information] statements," but does not discuss the exact content of those calls, other than indicating that they corroborated Morey's statements to investigators. The calls were apparently made while Nicholson was in state custody rather than in a Bureau of Prisons facility. But even if Nicholson had been in federal custody, the court finds that the affidavit did not violate defendants' rights by reporting the corroborating surveillance.

The Department of Justice Electronic Surveillance policy cited by the defendants explicitly observes that the Bureau of Prisons policy "exceeds the legal requirements regarding law enforcement access to monitored prison calls."[1] That is, the guidelines

---

[1] Electronic Surveillance Manual: Procedures and Case Law, Forms (2005), p. 53. Available at

are a policy preference, and defendants do not cite any authority indicating that a violation of the policy would require suppression by a court. The Manual itself expressly provides that it "is not intended to confer any rights, privileges, or benefits upon defendants."[2] And the Manual expressly cites authority holding that, while investigative monitoring "focused on a particular inmate" falls outside the policy, a court may still admit such evidence under an implied consent theory, given the prisoner's knowledge that such communications are routinely monitored. *See United States v. Green*, 842 F.Supp. 68 (W.D.N.Y. 1994).

There is nothing before the court to indicate that any monitoring of Nicholson while he was in county jail violated his constitutional rights. *See United States v. Gangi*, 57 Fed.Appx. 809, 815 (10th Cir. 2003) (recognizing the diminished expectation of privacy in prison phone calls).

The affidavit does not suggest or imply that an order authorizing interception existed, and defendants have not shown that under the circumstances such an order was necessary. Indeed, the affidavit actually implies that any Butler County jail intercept occurred independent of any warrant. Elsewhere in the affidavit, when

---

https://www.justice.gov/sites/default/files/criminal/legacy/2014/10/29/elec-sur-manual.pdf

[2] *Id.*, at i. The United States Attorneys Manual issued by Department of Justice is similar, stating that it "provides only internal ... guidance" and "is not intended to ... create any rights, substantive or procedural, enforceable at law by any party." The Tenth Circuit has expressly rejected the contention that the USAM creates independently enforceable interests. *Nichols v. Reno*, 124 F.3d 1376, 1376 (10th Cir.1997)

discussing other electronic communications in which the content is revealed (first between Nicholson and McQuiston, and second between Nicholson and Enriquez), the affidavit explicitly identifies the relevant court warrant authorizing the interception.

The issue before the court is whether the affiant improperly excluded information which would detract from the issue of probable cause. The magistrate judge reviewing the application was free to inquire as to the details of the corroboration cited by Anderson, but, quite reasonably, did not do so in light of the affidavit as a whole. Similarly, Agent Anderson's general indication that he had corroborated "all" the information given by Morey is not reasonably interpreted to mean every single utterance by her, but simply the important elements of her story—that she was heavily involved in the Nicholson organization, that the organization was extensive and active, and that the organization used safes or hiding places in the participants' residences—which had been related in the affidavit. From the court's review of the materials submitted, the court finds that these elements were corroborated, and finds the affiant did not unfairly relate the state of knowledge of the investigators.

The defendants' claim that the affidavit was false in asserting that Morey felt afraid and needed protection from the Nicholson organization is weakest of all. The defendants point to a transcript of a call between Morey and defendant McQuiston, in which McQuiston tells Morey "she has nothing to fear." (Motion, at 19).  It is hard to see how such an assurance from such a source would place Morey's mind at ease in any way. Indeed, at another point in the conversation, McQuiston herself admitted, "I'm

scared of everybody right now." The affidavit documents a very large and sophisticated methamphetamine operation. And Morey had heard from another member of the Nicholson organization (Tom Pool) that "he was scared for her, and believed NICHOLSON and CLARK may do harm to her."

The court finds no grounds for believing that the affiant substantially erred in relating what investigators had learned.

**Lindeman**

Anderson next reported that Task Force Officer Thomas Krausch interviewed LaShawnda Lindeman in October, 2014. He reported that Lindeman was known to be a criminal associate of Nicholson. Lindeman stated that Nicholson's residence on Lewis Street (11924 E. Lewis, Wichita, Kansas) contained secret compartments built into the walls that he used to store drug proceeds. Anderson reported that information received from LaShawnda Lindeman was believed to be credible. According to the affidavit, Lindeman had extensive knowledge of the Nicholson organization and admitted to being a distributor. At the time of the affidavit, Lindeman had limited contact and was no longer associated with the organization. Anderson briefly reported that he had been able to corroborate most of the information through other investigative means. He believed Lindeman was back to selling narcotics but was unclear if her source of supply was the Nicholson organization. She had not been re-interviewed to avoid alarming the organization if she had rejoined it.

In their motion to suppress, the defendants point to nothing which would directly contradict this report, observing only that they haven't found notes of the October, 2014 interview in the extensive discovery provided by the government. They stress that the affidavit does not expressly state how Lindeman knew of any link to the residence on East Lewis, or explain in detail how Anderson had corroborated her statement. And defendants suggest that in fact Anderson was actively misleading in his description of Lindeman's knowledge.

In particular, defendants point to a May 2, 2014 report of an interview with a source (SOI No. 6), which describes the source's interaction with Lindeman and his or her knowledge of Lindeman's actions in support of the drug trafficking. Specifically, the source indicates that Lindeman made deliveries to Clark's residence at 2012 S. Wichita (where Clark "had multiple safes"), to a residence of Nicholson at 2536 S. Mosley (where Nicholson "would have as much as 4 body sized duffel bags full of methamphetamine in his bedroom closet"), and Teague's house at 2551 S. Laura (where they would retrieve methamphetamine "from a safe in a bedroom"). In addition, Lindeman also apparently kept a safe under her house at 1747 S. Roanoke. The defendants stress that the report fails to mention the address which was the target of the 2015 search — the house on East Lewis.

But the focus of the statement is Source No. 6's knowledge of Lindeman's drug operations in 2014. It does nothing to indicate the extent of Lindeman's knowledge. with Nicholson's operations. Moreover, as indicated in the parentheticals in the

preceding paragraph, the report actually shows that the use of safes was a common practice of the Nicholson organization. As shown below, the affidavit presented strong evidence that Nicholson was actively involved in drug trafficking in June of 2015. Accordingly, there was strong reason to believe that, keeping to prior practice by the organization, safes containing evidence of that trafficking would be located at Nicholson's 2015 residence on East Lewis.

With respect to Lindeman's general credibility, the affidavit does not go into detail, but this fact is manifest. The magistrate judge was free to request additional information as to Lindeman's credibility if he desired. The materials submitted by defendants in conjunction with their motion do not provide any substantial basis for questioning the assessment given by Agent Anderson in the affidavit. Lindeman was extensively involved in the trafficking organization, and had personally observed the practice of retaining drugs and money in secured or hidden locations in the residences of the participants.

**The Kansas Wiretap**

The affidavit next related that Judge Belot had authorized the interception of McQuiston's telephone (316-882-9749) on December 3, 2014, and the telephones of Nicholson (316-284-7970) and Rourke (316-293-7982), as well as an additional target (620-605-1778) on April 8, 2015. Agent Anderson reported that DEA investigators used the intercepted communications, along with physical surveillance, and court-authorized

GPS tracking, to establish that McQuiston and Nicholson were close criminal associates involved in narcotics trafficking.

Specifically, the affidavit notes that on December 10, 2014, at 10:35 a.m., McQuiston told Nicholson,"OK, umm, I need to go umm to your friend's today for a little bit then I should be back in a couple of hours."

Anderson interpreted this conversation to mean that McQuiston was telling Nicholson that she would make a delivery of methamphetamine to one of Nicholson's customers that day, and it would take her a couple of hours to complete the delivery and return

Later the same day, at 2:13 p.m., Nicholson asked, "What are you doing, sweetie?" McQuiston replied, "Just watching TV." McQuiston told Nicholson, "I can cancel that for today if you need me to though." Nicholson replied, "mmmm." McQuiston replied, "She is gonna meet me uh, we are going to go shopping together, ummm, halfway." Nicholson stated, "Oh yeah, well shit, don't forget angel tree, OK ummm, if you can get back this way as soon as you can." McQuiston said, "Alright brother ..... It will be about 2 hours." Nicholson replied, "Two hours, OK, alright, please uh call me ..... " McQuiston replied, "I love you, I love you brother." Nicholson replied, "I love you too sweetie."

According to Anderson, in this call McQuiston informed Nicholson that she was planning to meet Dorsey (a methamphetamine customer) halfway between her house in Park City, and his house in Osborne, County Kansas, a trip of about two hours.

The defendants assert the affidavit is misleading because it fails to explicitly state that the authorization for interception ended on April 8, 2015, and that Judge Belot had sealed the resulting intercepts.

The court finds that the cited omission is not material. The purpose of this part of the affidavit is simply to show the continuing nature of the criminal enterprise, and the affidavit makes no representation that the intercept was ongoing. The calls mentioned in the affidavit were recorded during the lawfully authorized interception. They were placed under seal to prevent disclosure in the miscellaneous case, *In re Application of the United States for an Order*, No. 14-CM-60094-MLB, but the order did not prohibit the United States from using them for investigative purposes.

Next, defendants claim that the averments made by the United States in obtaining the wire intercepts contradict Anderson's 2015 search warrant affidavit. The court finds no contradiction. In the earlier affidavit, the government acknowledged the existence of some "Sources of Information", but stressed that the government had no confidential source then active in the Nicholson organization, and that any such involvement would be dangerous given the nature of the organization. The affidavit in support of the warrant reported:

> Although ***numerous interviews were conducted with different sources of information that were able to provide significant information*** on the inner workings of the NICHOLSON DTO, your Affiant believes that interviews of the Targets or their known associates would produce insufficient information concerning the identities of the individuals involved in the conspiracy, the source of the drugs, financing, the location of records, drugs, drug proceeds, or other pertinent information regarding

14

the subject crimes under investigation. Your affiant also believes that any response to interviews would contain a significant number of half-truths and untruths diverting the investigation with false leads or otherwise frustrating the investigation or be of limited value. Additionally, such interviews would like result in interviewees alerting the members of the conspiracy....

(Aff. ¶ 93 (emphasis added).

There is no substantial contradiction between the two affidavits. In the wiretap affidavit, the government directly acknowledges that it has substantial information on the Nicholson organization, gained through sources of information such as Lindeman and Morey. As Anderson later documents in the 2015 affidavit, these sources were generally credible. But while these sources might support for a finding of probable cause for a search, they were not enough in themselves to support arrest and trial of the defendants. The wiretap affidavit thus correctly notes that directly interviewing "the Targets" (i.e., Nicholson and his lieutenants) would be unproductive, eliciting "half-truths or untruths," if not dangerous.

The 2014 affidavit in support of the wire intercept looks at the investigation prospectively, and states reasonably that going forward the hypothetical employment of confidential informants was not then a valid alternative, even as it recognized the investigation has previously obtained "substantial" help from other sources of information. The 2015 affidavit in support of the search warrant sums up the results of the investigation, and incorporates all of the available evidence.

Defendants wrongly conflate the two affidavits (Motion, at 35) to argue that the

earlier affidavit somehow attributes the danger of half-truths and untruths to all sources of information, such as Lindeman and Morey, who might have aided the investigation. The affidavit in support of the intercepts, however, plainly attributes the danger of half-truths and untruths to any attempts to interview other, previously non-cooperating members of the Nicholson organization. Nothing in the interception affidavit provides any substantial basis for impeaching the credibility of Morey or Lindeman.

The defendants also generally attack the content of the validity of the wiretap warrants authorized by Judge Belot. (*Id.*, at 69-70). They argue that the government cannot "have it both ways" — by contending that electronic surveillance was necessary because traditional methods were unsatisfactory, while later contending that their traditional methods produced satisfactory results. (*Id.* at 43).

The defendants supply no support for an argument which would effectively require the government to chose either traditional investigative techniques, or electronic surveillance, but never both.   To obtain a wiretap, the government need not show that traditional methods have been "wholly unsuccessful." *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989). Rather, a wiretap may where traditional techniques produces some results but are unable by themselves to "develop the full scope and breadth of [the alleged] conspiracy." *United States v. Iiland*, 254 F.3d 1264, 1268 (10th Cir.2001). *See also United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) (electronic surveillance may be used where necessary to "determin[e] the dimensions of an extensive drug"). The exhaustion requirement is "simply designed to assure that wiretapping is not resorted

to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153, n. 12 (1974). That is, electronic surveillance should "not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

Here, the defendants have failed to overcome the presumptive validity of the wiretap authorizations. *See United States v. Foy*, 641 F.3d 455, 464 (10th Cir. 2011). The affidavits in support of the wiretaps established that traditional methods of investigation had been tried but were unlikely to succeed by themselves in exposing the full scope and details of the crimes of the alleged drug-trafficking conspiracy. Judge Gale, in later authorizing the search of the residence on East Lewis, could reasonably take account of both the results of the electronic surveillance and the significant evidence obtained from traditional methods.

**Physical Surveillance**

After th intercepted telephone call identified earlier in which McQuiston indicated she would travel some two hours to meet a customer, investigators observed McQuiston get into a red Jeep Cherokee and drive to the Wal-Mart located at 2900 S. 9th Street, in Salina, Kansas.

At approximately 2:53 p.m., officers saw Christina Ann Dorsey, who had been driving a white 2014 Dodge pick-up truck, exit the pick-up and get into McQuiston's Jeep. The officers also observed a white male with a white beard sitting in the pick-up.

17

After about 10 minutes, Dorsey got out of the Jeep and was observed carrying a white plastic sack and a box. She got back into the pick-up and left the area.

The investigators continued surveillance of the pick-up, which was stopped at 5:07 p.m. by Kansas Highway Patrol Trooper Greg Arnold. According to the affidavit, Arnold observed the pick-up make a lane change without signaling on I-70 in Ellsworth County Kansas.

At the request of the DEA, Arnold stopped the pick-up, and identified the driver of the vehicle as Dorsey and the passenger as Bobby Ray Hosier. Arnold determined that Dorsey's driver's license was suspended and placed her under arrest. Highway Patrol Troopers searched the pick-up and found a wrapped package. Inside the package was a white Hoover vacuum bag, and inside this was a plastic bag containing approximately 225 gross grams of a crystal substance that field tested positive for the presence of methamphetamine. At the time of the affidavit, the material had been submitted to the DEA laboratory for analysis, but results had not been returned.

Officers continued surveillance of McQuiston's residence located at 6354 Randall, Park City, Kansas.

Defendants contend that the affidavit is materially misleading because it fails to mention Dorsey wasn't charged with possession of methamphetamine, but that Hosier was charged or that the case was ultimately dismissed by the Ellsworth County District Court, the court finding that the search of the vehicle was invalid under *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). In addition, defendants cite notes from the stop

indicating that highway patrol troopers deployed a drug dog which did not alert to Dorsey's vehicle.

The court finds no basis for concluding that Agent Anderson deliberately or recklessly omitted information from the affidavit. The affidavit is devoid of any representation as to the results of the Ellsworth County case, and indeed indicates that at the time of the affidavit the results of drug tests had not been obtained. There is no indication that Anderson was aware of the results of the Ellsworth County case. More importantly, whether or not the actual results of the search are admissible or should be suppressed,[3] the remainder of the affidavit shows that McQuiston was indeed arranging for meetings with known customers of the Nicholson organization using coded language, and the latter was an ongoing criminal enterprise in late 2014.

---

[3] In *Rodriguez*, 135 S.Ct. at 1612, the Supreme Court held that a seizure justified only by a police-observed traffic violation "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." The case against Hosier was apparently resolved solely on the basis of "the language in the *Rodriguez* decision." *State v. Hosier*, No. 2014CR130 (D. Ellsworth County, May 5, 2015). It appears that investigators did not wish to reveal the existence of the wiretaps, and so never argued that the search was independently supported by probable cause. Thus, in his report, Trooper Arnold stresses that his questions to Dorsey were part of "continuing the rouse [sic] to prevent her from becoming aware of the ongoing DEA investigation."

**Texas Intercept**

The affidavit relates that, on May 17, 2015, Judge Gilmore of the Southern District of Texas authorized the interception of telephone number 832-591-6009, a phone number used by Ruben Enriquez. The court also authorized investigators to obtain the GPS location of the telephone utilized by Ruben Enriquez.

Defendants object to the use of this information, indicating that they have been unable to find such authorization, but acknowledge that it may have been filed under seal.


**Events of June 5**

As described in Paragraphs 26 to 42 of Agent Anderson's affidavit, the investigation determined by the GPS location of Ruben Enriquez's phone that he was at the Best Western Hotel located at 8300 E. Kellogg, Wichita, Kansas. Investigators began surveillance at the hotel, and saw a black Cadillac Escalade pick-up with a Texas registration. The investigators checked with other law enforcement sources, and found that the Escalade was associated with Ismael and Ruben Enriquez.

At 12:01 p.m. the same day, the DEA intercepted a telephone call between Nicholson and Ruben Enriquez, According to the affidavit, Nicholson said:

> I call and let you know I wasn't, you know, missing my deadline ...... I went and counted up all that material (counted money) there. When I got counted, I had counted up to fifty-five ($55,000) so I was gunna have my nephew get around and go check out where the other seven ($7,000) is.

Enriquez replied, "OK.," and Nicholson continued, " .... just a couple more hours, brother, but I'll be to you by this afternoon sometime, OK?"

After Enriquez agreed, Nicholson stated, "I'll just pick you up or your can meet me somewhere ...... I'll come pick you up is what I'll do, brother."

Enriquez said, "Yea, OK, because that dude is waiting on me .... "

Nicholson said, "he's waiting on ... OK. All right, yep, give me uh, well, I'm .... we're working on it as [we] speak, brother, OK?" Enriquez said, "Yes, sir. OK, that'll work."

According to Anderson, the conversation meant that Nicholson had collected and counted $55,000, but was $7,000 short of the amount of money he was to give to Enriquez. Nicholson told Enriquez that he (Nicholson) had assigned one of his criminal associates to collect the additional $7,000. Additionally, Nicholson agreed to pick Enriquez up later when they meet.

At 12:27 p.m., Enriquez called Nicholson and said, "I talk to my brother and, .... He want me to see if I can do that, then I can let ... let his guy go (the individual who was assigned to smuggle the drug proceeds that were to be obtained from Nicholson to points south) then I can do the rest the other way."

Nicholson said, "Yes, yes. Well, We can do that ... if you just give me like maybe just another two hours, brother, I can have it all, but if you wanna ... do it that other way we can do it like that too. I'm, I'm getting ready to getting the shower right now, brother, and then I can come your way."

21

Enriquez responded, "OK, alright, brother, let's do that that way. I can send this because he's, he's been calling like he's ready, ready."

Nicholson said, "Give me about, give me about uh ... forty minutes I'll be to you."

In addition to setting out the text of the intercepted call, Agent Anderson interpreted the call in the affidavit to indicate that Enriquez and Nicholson agreed to meet later for Nicholson to give Enriquez the $55,000 in U.S. currency, and that Nicholson would give Enriquez the additional $7,000 later.

At 12:49 p.m., the officers conducting the surveillance saw Ruben Enriquez exit the hotel, get into the Escalade, and drive to the Wal-Mart located at 11411 E. Kellogg in Wichita. He went into the store. The surveillance officers later saw Enriquez return to his vehicle carrying a white Wal-Mart sack.

At 1:08 p.m., Nicholson called Enriquez and said,   "Hey brother, I be there in about five minutes." Enriquez replied, "OK, brother, I'm right here across the street right now at Wal-Mart. I come to get something (cellophane and dryer sheets) to clean ...... my shoes."

Nicholson replied, " .... well then, I'll be right there."

Enriquez said, "oh, OK, alright, brother that's cool. ..... I'm fixing to get out."

Nicholson asked, "you, you in? You in .... OK. OH, You gunna go in?"

Enriquez replied, "Alright, I, I'm fixing to get out, I already, I already finish."

Nicholson replied, "OK well then, I'll be right there."

According to Agent Anderson's summary, Enriquez told Nicholson in this

conversation that he would be using items from the store to wrap and hide any odor of drug residue on the $55,000 in U.S. currency that Nicholson was bringing. Enriquez indicated he was about to leave the store, and Nicholson would be there soon.

Two minutes later surveillance observed Danny Nicholson, driving a black and gold Ford Expedition with Oklahoma registration, drive into the Wal-Mart parking lot and park his vehicle by Enriquez's Escalade.

Enriquez got into the passenger side of Nicholson's vehicle. Nicholson drove away, leaving the unoccupied Escalade in the Wal-Mart parking lot.

At around 1:20 p.m., the investigators saw Nicholson drive to the area of his residence at 11924 E. Lewis. At around 1:45 p.m., they saw the Expedition, occupied by Nicholson and Enriquez, leave the attached garage at 11924 E. Lewis.

Some four minutes later, the officers saw Enriquez leave the Expedition carrying a white Wal-Mart sack. The sack seemed heavier than the sack Enriquez had carried out of the Wal-Mart store. Enriquez walked to his Escalade, opened a tool box in the back with a key, and placed the sack inside. Enriquez and Nicholson left the area in their respective vehicles.

About six minutes later, Enriquez called telephone number 956-652-8381, and asked "What do you say buddy?" A male voice responded "What do you say?"

Enriquez asked, "how you doing, where can I see you?"

The male voice responded, "Good, good, over there at the same place."

When Enriquez indicated he did not know where that was, the other person

23

responded that he was towards the rear of the Hampton Inn on West Street and Kellogg. Enriquez said, "I'll be there in about five minutes, five or seven," and said that he was in "a black truck."

At 2:13 p.m., officers saw Enriquez drive into the parking lot of the Hampton Inn located at 3800 W. Kellogg Drive, Wichita, Kansas. Enriquez parked his Escalade towards the rear of the parking lot. Enriquez got out and removed the white sack from the tool box in the back. He then handed the sack to an occupant of a Dodge van that had just arrived in the lot and parked near the Escalade. Shortly afterwards, Enriquez left the area in his Escalade.

Officers continued surveillance of the minivan, which was occupied by two individuals. At least one of the minivan's occupants could be seen moving around and working inside the rear area of the van.

The minivan left the Hampton Inn lot at about 2:30 p.m. When the driver later failed to give a required turn signal near the Woodlawn and Central, Wichita Police Officer Weidner (at the request of DEA) stopped the vehicle.

Weidner identified the driver of the minivan as Carlos Rangel and the passenger as Juan Zapata. Weidner reported that Rangel appeared to be "overly nervous" compared to how most individuals act during a traffic stop.

Based on information provided by DEA, and by his own observations during the traffic stop, Weidner utilized his certified canine around the minivan. The dog alerted on the minivan, indicating the presence of the odor of an illegal drug.

24

TFO Maria Heimerman called telephone number 956-652-8381 (the number which Enriquez had called to arrange the Hampton Inn meeting). At the same time as the call was placed to 956-652-8381, Weidner heard a phone ringing in the van.

The minivan was searched and Weidner found a hex head screw driver in the pocket of the front passenger seat. He removed a panel in the right rear area of the van, the same area where officers had observed one of the van passengers to be working, and used the hex head screw driver to remove a speaker. Inside, he found four packages wrapped in tape, cellophane and dryer sheets.

Further inspection indicated that the packages contained $53,320 in U.S. currency.

Zapata and Rangel denied knowledge of the currency. The packages of currency and three cell phones were seized from the vehicle. Zapata and Rangel were released from the scene.

The defendants present multiple objections to the affidavit's discussion of the events of June 5, 2015. First, they note that the affidavit does not that mention the interception authorized by Judge Belot ended by this time.

The court finds the omission is not important. The affidavit does not suggest that the Kansas order intercepting Nicholson's phone remained in place. Instead, the affidavit clearly indicates that the tap was on Enriquez's phone, and the affidavit clearly indicates that tap was authorized in Texas.

The defendants complain that the affidavit "omitted the material fact that the

12:01 pm phone call was not placed in or near The Residence [i.e., on East Lewis]." (Motion at 52). In fact, the affidavit is silent as to Nicholson's location at the time of the call. The affidavit merely indicates that Enriquez was at this hotel at the time of the call.

The defendants ask, if GPS was available, why couldn't the investigators use it to track Enriquez's movements in Wichita, but "simply [used] physical surveillance instead?" (Motion, at 52, 59). The answer is not difficult – because physical surveillance is better as it not only follows a suspect's movements but also documents what they are doing at the time. Defendants present no reason at all to believe that GPS tracking would contradict Agent Anderson's sworn description of Enriquez's movements.

Nor does the affidavit in any way "conceal" the absence of ongoing GPS tracking. The affidavit directly alleges that the officers tracked Enriquez to the Best Western by GPS location, but otherwise is silent. The magistrate judge could have asked about such tracking, but did not do so. His purpose was not to determine if the affidavit presented a showing of guilt beyond a reasonable doubt, but simply to find whether it showed that it was likely that evidence of criminal activity would be found at Nicholson's residence. He reasonably concluded that it did.

Defendants complain that the affidavit fails to make any mention of stops between the Best Western and the Wal-Mart, or later between Wal-Mart and the Hampton Inn. But there is no indication there were any, or why they would be material if they occurred.

Subsequently, on June 8, 2015, investigators went into the store and asked for

security footage of Enriquez checking out. They were later able to determine that he bought stretch wrap and dryer sheets.

Defendants argue that the investigator should have asked for security footage of the parking lot. Nor, they stress, did Anderson tell the magistrate judge of the absence of security footage of the Hampton Inn parking lot.

Again, the issue fails to support requiring a *Franks* hearing. Investigators asked for security footage to see what Enriquez bought in the Wal-Mart because they had not personally observed what happened in the store three days earlier. They didn't need security footage of the parking lot, as it had been under their direct observation.

Nor is it true that, as defendants claim with respect to the parking lot footage, the magistrate judge "was not aware of this fact." The absence of parking lot video was not in any way concealed. The affidavit makes no mention of parking lot security footage one way or other. As with the hypothetical electronic tracking of Enriquez's phone, the magistrate judge could have inquired if any parking lot security footage existed or asked to have it produced. But such a request was unnecessary, given the strong evidence of probable cause supplied by the affidavit.

Next, defendants complain that a "white sack" is not mentioned in investigators notes.  The court finds the argument lacks merit, and the evidence cited does not support any claim of deliberate or reckless misrepresentation. Defendants rely on the notes of one investigator only, apparently those of TFO Davis. The notes record a description of Enriquez as he entered the store at 12:57, but do not mention anything

with respect to what he may have been carrying when he left, only that he was "at self check out" at 1:10, indicating that he was indeed buying something.

And we independently know from the internal store footage that Enriquez was in the store and did buy stretch wrap and dryer sheets. So he left with something. And a DEA Report only three days after the surveillance reported directly that officers "observed [Enriquez] exiting the store holding a white Wal-Mart plastic sack," and that, after returning to Wal-Mart from Nicholson's residence, TFO Krausch "observed [Enriquez] holding a white Wal-Mart sack that appeared fuller in size" compared to what he had left the store with less than an hour earlier. In addition, the Davis notes cited by defendant Nicholson explicitly record that, at 1:49, "Ruben w/sack put in tool box locked w/key." And the same notes indicate that later at the Hampton Inn the officer saw Enriquez "got tool box handed left hand white [illegible]."

With respect to the events after the Hampton Inn meeting, defendants speculate that perhaps Rangel and Zapata went elsewhere between when the minivan left the lot and when it was stopped at 2:44. They complain the affidavit lacks details as to the minivan's movements between when it left and when it was stopped, the reasonableness of the stop, any reference to dashboard video that might exist as to the stop, the time of the drug dog alert, etc.

There is no evidence before the court indicating that anything occurred which would detract from probable cause. And again there were no *omissions* – the affidavit makes no reference to the information and does not suggest a contrary state of affairs.

28

The magistrate judge could, if he chose, inquire as to the propriety of the stop. As noted earlier, the issue before the magistrate judge was whether the affidavit presented probable cause, and it does. The affidavit does not conceal or misrepresent anything. Defendants' arguments are properly addressed to the ultimate finder of fact, but do not present any substantial grounds for attacking the warrant itself.

At most, defendants have cited minor differences, or silence, in underlying notes of various investigators. The cited matters are relatively insubstantial, and do nothing to support a claim of willful or reckless concealment of material evidence.

**Arrest**

Shortly after the apparent drug transaction, on June 11, 2015, Roman Padilla was shot and killed outside his residence located at 533 S. Edwards, Wichita, Kansas.

After Padilla was killed, Justin Rourke, Danny Nicholson, and Amber Wallis, left the scene of the homicide and drove to the Wichita Police Department West Side substation. Afer receiving Miranda warnings, Rourke told police that he, Nicholson, and Wallis had gone to Padilla's residence to retrieve a dog. Upon their arrival, an argument occurred about the dog. Rourke said Padilla went into the residence, retrieved a baseball bat, and charged at Rourke and Nicholson. Rourke shot and killed Padilla, and later shot and killed a different dog at the residence. Rourke made this statement post-*Miranda*.

After waiving his *Miranda* rights and while represented by counsel, Nicholson

stated he, Rourke, and Wallis went to Padilla's house to retrieve a dog that was owned by his girlfriend. Nicholson and Rourke contacted Padilla, while Wallis stayed in their vehicle. An argument with Padilla broke out and Padilla went into his house. He returned with a ball bat and moved towards Nicholson and Rourke. Rourke then shot and killed Padilla. Nicholson stated he, Rourke, and Wallis left and went to report the shooting. During the interview Nicholson advised police that his home address was 11924 E. Lewis, Wichita, Kansas, and he had lived in this residence for two years.

After consultation with DEA in Wichita, and the United States Attorney's Office in Wichita, Kansas, the police arrested Nicholson pending formal federal charges. At the time of his arrest, police found $1,200 U.S. currency on Nicholson's person. They also found a bank deposit slip, dated June 11, 2015, in the amount of $5,000.

Agent Anderson reported his belief that the money was the proceeds of the narcotics trafficking in addition to what had been seized on June 5, 2015.

The affidavit also stated that TFO Maria Heimerman had previously requested wage and employment information from the Kansas Department of Labor in regard to Daniel Nicholson. Those records showed that wages were reported for Nicholson in the third and fourth quarters of 2012 and the first quarter of 2013 at Jiffy Lube. The total amount for all three quarters was $12,166.15. Agent Anderson reported he was unaware of any record of legitimate income by Nicholson since that time. Records have revealed that Nicholson has never filed a Kansas tax return and they did not have a tax account set up for him.

The affidavit also reported that on June 12, 2015, Westar Energy listed McQuiston and Daniel Hernandez, and the City of Wichita Water Department listed Nicole McQuiston, as the responsible billing parties for the respective services.

On June 11, 2015, Nicholson admitted to law enforcement that he resided at 11924 E. Lewis, Wichita, Kansas. The affidavit reported that on numerous occasions, including   December 7, 2014, January 15, 2015, January 17, 2015, and June 5, 2015, this surveillance has observed Nicholson and associates of Nicholson coming and going from the residence located at 11924 E. Lewis, Wichita, Kansas. Finally, the affidavit reported, multiple court authorized wire intercepts indicated that 11924 E. Lewis, Wichita, Kansas, was the residence of Nicholson.

Defendants complain (Motion, at 69) that the affidavit fails to explicitly state that Nicholson was not charged with the killing of Padilla. The court finds no material omission or any circumstance which would suggest the omission was intentional or reckless. The affidavit makes no suggestion that Nicholson was criminally responsible for Padilla's killing. The affidavit does not suggest that at the time of the affidavit there was a reason to suspect such responsibility. Rather, the affidavit presents the story of the arrest simply as means of explaining why Nicholson was in custody at the time of the application for the warrant.

Shortly after the warrant was executed on the house on East Lewis, Agent Anderson submitted a Supplemental Affidavit, relating that Anderson had learned that Lindeman had recently been arrested on a charge of possession of methamphetamine.

31

He further stated that officers executed the warrant on the residence on East Lewis on June 12, 2015 at 8:05 p.m. Anderson and other investigators noticed a strong smell of burnt marijuana. Anderson saw McQuiston moving quickly down the hall and appeared to be moving her hand on the front area of her pants. Task Force Officer Shauna Sherwood asked McQuiston if she had something down her pants, and McQuiston admitted that she hid an amount of "ice" (methamphetamine) down her pants. Sherwood was able to retrieve a small plastic container that contained a small amount of a crystalline substance that was consistent with the appearance of methamphetamine.

During their initial search, Anderson and Task Force Officer Gary Knowles observed a large stack of U.S. Currency in plain view on top of a safe in the master bedroom in the basement. In a subsequent, more thorough search, WPD Officer Weidner and Task Force Officer Will Mahoney found the safe contained a large stack of currency, 22 cylindrical bundles wrapped in cellophane and what appeared to be grease. Anderson, Weidner, and Mahoney have previously encountered methamphetamine wrapped in this same manner.     In a dresser drawer in the basement master bedroom, investigators found 14 mason-type glass jars containing a green leafy vegetative substance that they believed by their training and experience to be marijuana. They also found some 13 baggies of a similar substance in a suitcase on the floor in the basement master bedroom closet.

**Legal Conclusions**

The court finds that defendants have failed to show that Agent Anderson intentionally or recklessly included either material false statements in the affidavit or omitted material information. A *Franks* hearing is not required unless defendant presents a "substantial showing that ... the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir.1997). Probable cause exists if, "given all the facts and circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 1378 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (internal quotations omitted)

"[T]he substantiality requirement" triggering a hearing on the validity of an affidavit in search of a warrant, "is not lightly met." *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006). *See also United States v. Bennet*, 905 F.2d 931, 934 (6th Cir. 1990) (a "defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden"). There is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171.

"[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir.1997). A defendant should present affidavits of witnesses which contradict the affidavit, or explain why they are absent. *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004). There is no right to a *Franks*

33

hearing if a defendant simply shows that an officer has acted negligently or made an innocent mistake. *Id.*

A hearing is not required where a defendant fails to show intentional or reckless concealment, and merely "present[s] minor inconsistencies" in the record, *United States v. Benanti*, 2017 WL 2990856, *3 (E.D. Tenn. July 13, 2017) or, operating by "hindsight, propose[s] possible inconsistencies between the affidavit and the documents." *United States v. Johnson*, 1994 WL 805243, *8 (W.D.N.Y. May 26, 1995). *See United States v. Ozar*, 50 F.3d 1440, 1445–46 (8th Cir. 1995) (court must focus on the content of the affidavit, rather than "what defendants assert with the benefit of hindsight the government should have known").

Applying these standards, the court finds defendants have failed to show the necessity for an evidentiary hearing and denies the motion to suppress. Because of the extensive nature of the case and number of defendants, trial of the charges against the remaining defendants has been delayed. But while the remaining defendants have thus had the benefit of two years of hindsight to identify alleged errors in the affidavit, the resulting catalogue presented by defendants does not just relief under *Franks*.

First, for the reasons stated earlier, the court finds that defendants have failed to show that Agent Anderson deliberately or recklessly included false statements in the affidavit, or deliberately excluded material evidence. Second, even if the affidavit were corrected to reflect defendants' present concerns, it would not affect the result. The affidavit presents a strong showing regarding the Nicholson drug-trafficking

organization and showed that the organization was active and ongoing, and that the members of the   organization typically used safes and hidden storage areas to protect its cash and proceeds. Given the contents of the affidavits, probable cause existed that evidence or proceeds of criminal activity would be found in safes located in the East Lewis residence.

IT IS ACCORDINGLY ORDERED this 28th day of December, 2017, that defendant McQuiston's Motion to Join (Dkt. 271) is granted; defendants' Motions to Suppress and for hearing (Dkt. 266) are denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE